CHARLES BROWN AND JIM JENKINS *v.*
CARL McDANIEL ET AL

5-4614                                    427 S. W. 2d 193

Opinion delivered March 18, 1968

*Griffin Smith,* for petitioners.

Prosecuting Attorney *R. B. Adkisson; Clay Robinson,* Asst. Pros. Atty., for respondents.

*Steele Hays* and Attorney General *Joe Purcell;*
*Thomas A. Glaze*, Asst. Atty. Gen., Amici Curiae.

GEORGE ROSE SMITH, Justice. This began as a tax-payer's suit brought in the Pulaski Circuit Court by Camille Lamar to enjoin the Pulaski County Board of Election Commissioners from conducting an election on March 12, 1968, for the selection of two directors of the Little Rock school board. When the parties realized that the proposed election of school directors involved in it-self no avoidable expenditure of tax money, because an election had to be held anyway to submit another mat-ter to the people, the plaintiff, as a patron of the dis-trict, amended her complaint to seek a declaratory judg-ment with respect to the validity of the proposed elec-tion of school directors and, if appropriate, an injunc-tion to prevent the submission of that issue to the voters.

On the merits the question for decision was wheth-er two incumbent directors who had been elected to three-year terms in September, 1965, were required to run for re-election in March of this year as a result of the passage of Act 171 of 1967, which changed the date of the annual school election from the last Tuesday in September to the second Tuesday in March. Ark. Stat. Ann. § 80-301 (Supp. 1967).

The two incumbents and their opponents, the appel-lants, intervened in the case. The trial court concluded that the incumbents are not required to stand for re-election this month. Upon that finding he enjoined the commissioners from going ahead with the election of school directors. This appeal was lodged, argued, and submitted to this court within a period of three days after the circuit court's decision. At the outset we issued a temporary stay of the trial court's order, to provide for the possibility that the proposed election might be found to be lawful. A day later we handed down a per curiam order reversing the circuit court's judgment "on the ground that the courts are without authority to en-

join the holding of a regular election, regularly called.'' We stated that a formal opinion would follow. This is that opinion.

We have not decided this exact point in any earlier case. An analogous situation, also involving the assertion of excessive power over the election process, was presented in *Irby* v. *Barrett*, 204 Ark. 682, 163 S.W. 2d 512 (1942). There the chairman and secretary of the Democratic State Committee had refused to allow Irby to qualify as a candidate in the Democratic primary, because those party officials had decided that even if elected Irby would not be eligible to hold the office he sought. After concluding that the statutes did not vest in the party chairman and secretary the authority they attempted to exercise, we went on, in language appropriate to the case at bar, to explain *why* such sweeping power ought not to be conferred upon two persons:

''If the chairman and secretary of the committee have the right to say that because of the decision of this court petitioner is ineligible to be a candidate for office, they may also say, in any case, that for some other reason a candidate is ineligible. For instance, it has been held by this court in many election contests that one must pay his poll tax; that he must do so after proper assessment in the time and manner required by law, and that otherwise he is not eligible even to vote, and unless he were a voter he could not hold office. So with other qualifications, such as residence. May this question be considered or decided by the chairman and secretary of the committee? It may be that such power can be conferred upon them by laws of this state or the rules of the party; but it is certain that this has not yet been done. If this can be done, and should be done, the door would be opened wide for corrupt and partisan action. It might be certified that a prospective candidate has sufficiently complied with the laws of the state and the rules of a political party to become a candidate, and, upon further consideration, that holding might be recalled; and

this might be done before that action could be reviewed in a court of competent jurisdiction and reversed in time for the candidate to have his name placed on the ticket. It would afford small satisfaction if, after the ticket had been printed with the name of the candidate omitted, he have a holding by the court that the name should not have been omitted.''

The situation now before us embraces an even greater threat to democratic government than that considered in the *Irby* case. If a court, trial or appellate, can at the eleventh hour prohibit a regular election, regularly called, it is at once apparent that the control of judges over the election process goes far beyond reasonable limits. In many states the courts themselves have been quick to recognize the absolute necessity of severe restrictions upon their own discretionary authority. We wholly agree with those decisions, as epitomized in the following quotations:

''The jurisdiction of any court, or of the whole judicial department of the government, to enjoin the expression of the popular will at a time and in the manner provided by statute, may well be doubted. If the election, when held, was not according to statute, or if the statute was enacted without any constitutional authority, the courts might very well hold the election invalid. But that is quite another thing from enjoining the people from peaceably assembling and casting their votes for or against any proposition submitted to them under the color of law.'' *Lamb* v. *The B., C. R. & M. R.R.*, 39 Iowa 333 (1874).

''But the attempt to check the free expression of opinion—to forbid the peaceable assemblage of the people—to obstruct the freedom of elections—if successful, would result in the overthrow of all liberty regulated by law. The mere effort to assume such power is dangerous to the rights of the citizen. If the courts can dictate to the officers of the people that they shall not

hold an election from fear of some imaginary wrong, then people and officers are entirely subservient to the courts, and the consequences are too fearful to contemplate.

"The principle which would authorize the mighty mandate of a court of chancery, in this case, would justify it in every election to be held by the people, and thus the whole administration of the government might be obstructed and all power and authority placed at the footstool of the judge." *Walton* v. *Develing*, 61 Ill. 201 (1871).

"The mere fact that the present suit was brought as a suit under the Uniform Declaratory Judgments Act . . . does not alter the situation, as it was not the purpose of such Act to extend the jurisdiction of the courts over matters which are purely political. The rule still obtains in this State that 'an election is essentially the exercise of political power, and, during its progress, is not subject to judicial control. This comprehends the whole election, including every step and proceeding necessary to its completion.'" *Killam* v. *Webb County*, Tex. Civ. App., 270 S. W. 2d 628 (1954).

We do not imply that a declaratory-judgment action or a taxpayer's suit might not in some instances be used to settle questions involved in an election to be held in the future. It is essential, however, that the proceeding be brought in sufficient time to permit the issues to be fully considered, on their merits, with adequate time for both sides to prepare and present their contentions. It may be remembered that in 1952 we dismissed an attack upon a referendum petition on the ground that the time remaining before the election was too short for the completion of testimony upon the issue of fraud. *Ellis* v. *Hall*, 221 Ark. 25, 251 S. W. 2d 809 (1952).

When the present case was presented to us, four days before the scheduled election, our only sound

course was to let the election be held, leaving the parties to their post-election remedies, which are unquestionably adequate. The attack upon the validity of the election came so late that there was no possibility whatever of our giving sufficient study to the merits of the parties' substantive contentions. Indeed, counsel for the appellants frankly admitted in oral argument that he was unprepared, owing to the extreme haste with which the case had been processed. Hence our per curiam order, reversing the trial court's decision, was expressly without prejudice to further proceedings in the matter.

The per curiam order of March 8, 1968, is confirmed.